1   WO

2

3

4

5

6                 **IN THE UNITED STATES DISTRICT COURT**

7                     **FOR THE DISTRICT OF ARIZONA**

8

9   Shaka,                                    No.  CV 10-2253-PHX-SMM (BSB)

10                     Plaintiff,

11         v.                                         **O R D E R**

12   Charles Ryan, et al.,

13                     Defendants.

14

15         Plaintiff Shaka, who is a prisoner in the custody of the Arizona State Prison

16   Complex-Yuma ("ASPC-Yuma"), brought this civil rights case pursuant to 42 U.S.C.

17   § 1983.  (Doc. 33.)  Defendants Ryan and Chenail move for summary judgment (Doc.

18   254), and Plaintiff opposes and cross moves for summary judgment (Doc. 292), which

19   Defendants oppose (Doc. 301).[1]

20         The Court will grant Defendants' Motion for Summary Judgment and will deny

21   Plaintiff's Cross-Motion for Summary Judgment.

22   **I.     Background**

23         Plaintiff's claims stem from his incarceration at the ASPC-Eyman in Florence,

24   Arizona and ASPC-Yuma in San Luis, Arizona.  (Doc. 33 at 1, 25.)   The single

25   remaining claim in this action concerns the alleged deliberate indifference to Plaintiff's

26   _____

27         [1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d
28   952, 962 (9th Cir. 1998) (*en banc*), regarding the requirements of a response.  (Doc. 256.)

serious medical needs as set forth in Count II of Plaintiff's First Amended Complaint. Plaintiff alleged that in January 2010 he injured his shoulder and, despite submitting a Health Needs Request ("HNR") on January 8, 2010, he did not see a physician until May 18, 2010. (*Id.* at 25.)  Dr. Herrera examined Plaintiff at that time and initially diagnosed a torn rotator cuff. (*Id.*)  X-rays were scheduled and a request for an MRI was submitted. (*Id.*)

Plaintiff was transferred to ASPC-Yuma on June 11, 2010.  On August 10, 2010, the Facility Health Administrator ("FHA"), Defendant Dennis Chenail, interviewed Plaintiff.  Chenail told Plaintiff that medical staff in Yuma had no way of knowing if and when Plaintiff would be seen by an orthopedic specialist, or if orthopedic surgery would be approved, and that it would probably be sometime in 2011 before Plaintiff could be seen because of all the inmates in fourteen complexes waiting to be seen.  Plaintiff further alleged that Defendant Chenail "approved the delay of medical care" on August 12, 2010, and that Defendant Arizona Department of Corrections ("ADC") Director Charles Ryan approved the delay in medical care and lack of surgery on September 22, 2010. (*Id.*)

Plaintiff alleged that he was in constant pain and was denied pain medication because his injury "does not meet AD[]C's c[h]ronic definition." (*Id.*)  Plaintiff eventually received surgery on March 4, 2011, fourteen months after his injury.  Plaintiff seeks damages. (*Id.* at 27.)

On March 6, 2013, the Court denied Defendants' first motion for summary judgment as to Plaintiff's medical deliberate indifference claim in Count II.  (Doc. 193.)  The Court determined that genuine factual disputes existed as to whether Defendants Ryan and Chenail were aware of and disregarded a substantial risk of harm to Plaintiff in failing to ensure he received a timely appointment with an orthopedic specialist and treatment for his injury.

In a March 19, 2014 Order, the Court granted Defendants leave to file a second motion for summary judgment in light of the Ninth Circuit's recent en banc decision in *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014), which held that a lack of resources is a

1    defense to liability for constitutional violations if an official could not procure the
2    resources necessary to prevent the violation. (Doc. 241.) Defendants' second Motion for
3    Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment are now before
4    the Court.

5    **II.     Summary Judgment Standard**

6          A court "shall grant summary judgment if the movant shows that there is no
7    genuine dispute as to any material fact and the movant is entitled to judgment as a matter
8    of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23
9    (1986).   Under summary judgment practice, the moving party bears the initial
10   responsibility of presenting the basis for its motion and identifying those portions of the
11   record, together with affidavits, if any, which it believes demonstrate the absence of a
12   genuine issue of material fact. *Id.* at 323.   If the moving party meets its initial
13   responsibility, the burden then shifts to the opposing party who must demonstrate the
14   existence of a factual dispute and that the fact in contention is material, i.e., a fact that
15   might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby,*
16   *Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such
17   that a reasonable jury could return a verdict for the non-moving party. *Id.* at 250;
18   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).
19   The opposing party need not establish a material issue of fact conclusively in its favor; it
20   is sufficient that "the claimed factual dispute be shown to require a jury or judge to
21   resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Arizona v.*
22   *Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968).

23         When considering a summary judgment motion, the court examines the pleadings,
24   depositions, answers to interrogatories, and admissions on file, together with the
25   affidavits or declarations, if any. *See* Fed. R. Civ. P. 56(c).   At summary judgment, the
26   judge's function is not to weigh the evidence and determine the truth but to determine
27   whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.   The evidence of
28   the non-movant is "to be believed, and all justifiable inferences are to be drawn in his

favor." *Id.* at 255.  But, if the evidence of the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted.  *Id.* at 248-49. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment").

**III.   Relevant Facts**

The undisputed and disputed relevant facts are derived from the parties' separate Statements of Fact and supporting exhibits (Docs. 252, 293), as well as facts and exhibits submitted by the parties in support of their original cross-motions for summary judgment (Docs. 173, 183).[2]

**A.   ADC's Healthcare Contracts**

In 2009, the Arizona Legislature passed legislation that reduced the reimbursement rate to ADC's outside medical contractors.  (Doc. 252 ¶¶ 14-16.)  A.R.S. § 41-1608, which became effective November 24, 2009, set the maximum reimbursement rates to outside providers at the Arizona Health Care Cost Containment System ("AHCCCS") rates.  (*Id.* ¶ 17.)  Two providers, Carondelet Health Network ("CHN") and Maricopa Integrated Health Systems ("MIHS"), canceled their specialty services contracts with the ADC in November 2009 due to their refusal to accept the AHCCCS rates.[3]  (*Id.* ¶ 17.)

---

[2] Plaintiff's Statement of Facts ("PSOF") either admits, disputes, or denies each fact in Defendants' Statement of Facts ("DSOF") or states that Plaintiff has insufficient information regarding a particular fact.  Therefore, the Court will draw largely from Defendants' facts and note, where relevant, any dispute or denials by Plaintiff.

[3] ADC's contract with CHN "included a 300-plus physician specialty group" for inmate services.  (Doc. 252 ¶ 35.)  Defendants did not provide the number of physicians under the MIHS contract.

1    In December 2009, ADC's Health Services Bureau compiled a list of specialty

2    providers willing to see ADC inmates at AHCCCS rates and distributed the list to the

3    facilities in January 2010.  (Doc. 252 ¶ 20.)

4    As of February 8, 2010, ADC had two orthopedic physicians—one in Phoenix and

5    one in Tucson—available to provide emergency care to inmates throughout the state.

6    (Doc. 252 ¶ 38.)  By June 17, 2010, two general orthopedists in Sierra Vista, Arizona,

7    were willing to accept ADC inmates.  (Id. ¶ 42.)  On July 15, 2010, ADC entered into a

8    contract with Iasis Healthcare, which included seven orthopedic physicians from

9    Physicians Group of AZ, Inc.  (Id. ¶ 43.)  On August 19, 2010, ADC updated its list of

10   available specialty providers to include nine orthopedic physicians.[4]  (Id. ¶ 45.)

11   After the change in reimbursement rates, ADC's Health Services Division

12   instituted a process for centralized review by the Medical Program Manager of ongoing

13   specialty consultation requests in order to prioritize them for approval.  (Doc. 252 ¶ 21.)

14   A review committee "triaged and prioritized outside consultation request [sic] based on

15   acuity, and, if approved, it then forwarded the request to Health Services at the ADC's

16   Central Office."  (Id. ¶ 64.)  Dr. Rowe, the Medical Program Manager, or a delegated

17   staff member, "reviewed all of the specialty consultation requests for final approval,"

18   and, once approved by the Central Office, the local Clinical Coordinator would schedule

19   the outside appointments with contracted providers.  (Id. ¶¶ 64-65.)

20   Defendants Ryan and Chenail were not directly involved in procuring new

21   contracts for medical services, which was the responsibility of ADC's Procurement

23
24   [4] It is not clear if the nine orthopedic physicians are in addition to the two
     orthopedic physicians willing to provide emergency care, or if two physicians had
25   dropped off the list altogether.  Also, Plaintiff does not specifically dispute the number of
     orthopedic physicians listed in DSOF paragraphs 30 through 48, but adds the number of
26   vendors available for MRIs during the same time period, noting that there were five MRI
     vendors as of February 8, 2010, seven MRI vendors as of May 20, 2010, and ten MRI
27   vendors as of June 7, 2010.  (Doc. 293 at ¶¶ 30-48.)  In addition, Plaintiff asserts that
     ADC's vendor update through August 19, 2010, showed a total of 21 MRI vendors and
28   13 orthopedic physicians.  (Id. ¶ 48.)

1    Services Unit.   (Doc. 252 ¶ 46.)   Neither Ryan nor Chenail are licensed medical
2    professionals and neither made decisions regarding medical issues or directed medical
3    treatment.[5]   (*Id.* ¶¶ 9, 82.)

4         According to Defendants, from the time CHN and MIHS canceled their contracts
5    in November 2009 until the July 2010 contract with Iasis, ADC experienced a backlog of
6    inmates requiring specialty services, including orthopedic services, and this backlog
7    continued through 2011.  (Doc. 252 ¶ 48.)  As of December 12, 2011, over 1,700 inmates
8    were still waiting for a specialty appointment, including 241 orthopedic consults.  (*Id.*)

9         **B.    Plaintiff's Attempts to Obtain Healthcare**

10        Plaintiff injured his shoulder in January 2010 while at ASPC-Eyman and
11    submitted an HNR on January 8, 2010, stating that he was experiencing extreme pain in
12    his right shoulder upon movement.  (Doc. 183 at 16.)  The response to Plaintiff's HNR
13    indicated that Plaintiff was scheduled for the nurses' line.  (*Id.*)  Plaintiff submitted an
14    Inmate Letter dated April 19, 2010, stating that he had not been seen by medical since
15    submitting his emergency HNR on January 8, even though he checked on his request a
16    couple of times a week for a month after filing his HNR.  (Doc. 175-1 at 61.)  Plaintiff
17    wrote that he was told that medical was backlogged and two months behind.  (*Id.*)  The
18    May 10 response from CO III Felkins stated that medical said they did not receive an
19    HNR from Plaintiff in January and that Felkins was unable to resolve Plaintiff's issue.
20    (*Id.* at 63.)

21        Plaintiff submitted an Inmate Grievance to CO IV Sheridan dated "5/  /10," stating
22    that his medical condition was getting worse and he was losing more use of his right arm.
23    (Doc. 175-1 at 64.)   On May 13, Sheridan returned the grievance unprocessed for
24    procedural reasons but did advise Plaintiff that he was scheduled to see the provider the
25    following week.  (*Id.* at 65.)  Plaintiff next submitted an Inmate Letter dated May 17 to

---

27   [5] Plaintiff disputes DSOF ¶ 9, asserting that Defendant Ryan approves and signs
     all medical policy and has authority that he delegates.  (Doc. 293 ¶ 9.)  Plaintiff also
28   disputes DSOF ¶ 82, asserting that Defendant Chenail, as the FHA, "is designated as the
     responsible health authority" under the "M.S.T.M."  (*Id.* ¶ 82.)

1    the Grievance Appeal Officer at ADC's Central Office regarding his unprocessed

2    grievance and his attempts to obtain medical care since submitting his HNR on January 8.

3    (*Id.* at 66.)  FHA Kendall at ASPC-Eyman responded on June 10 that Plaintiff's medical

4    records had been reviewed, noted that Plaintiff was seen by a healthcare provider on May

5    18, and that he hoped all of Plaintiff's issues were resolved.  (*Id.* at 67.)

6          On May 18, 2010, Dr. Herrera examined Plaintiff regarding his right shoulder pain

7    and prepared an Outside Consult Request ("OCR"), which he marked as "urgent," for an

8    outside orthopedic consult and a possible MRI.  (Doc. 175-1 at 40-41.)  Herrera also

9    ordered right shoulder x-rays and 600 mg ibuprofen for 30 days.  (*Id.* at 40.)

10         Plaintiff was transferred to ASPC-Yuma on June 11, 2010.  (Doc. 252 ¶ 3.)  The

11   medical staff at ASPC-Yuma found the May 18 OCR in Plaintiff's medical chart for an

12   orthopedic consult and possible MRI.  (*Id.* ¶¶ 66-67.)  The OCR had been approved by

13   the local Medical Review Committee in Florence, Arizona, but had not been entered into

14   the ADC database.  (*Id.* ¶ 67.)  ASPC-Yuma's Clinical Coordinator, Carrie Feehan,

15   entered the OCR into the database for approval on June 16.  (*Id.* ¶ 68.)  The Central

16   Office approved the request on June 17; the following day, Feehan faxed the approved

17   OCR to the Clinical Coordinator at ASPC-Tucson to obtain a purchase order from

18   AHCCCS and to schedule an appointment for Plaintiff at Mountain Vista Medical

19   Center.[6][7]  (*Id.* ¶¶ 68, 70.)  According to Feehan, in mid-2010, it took several months to

21         [6] Because of the new centralized process, ASPC-Tucson was the medical "HUB"
22   for ASPC-Yuma, and the ASPC-Tucson Clinical Coordinator was responsible for
     scheduling orthopedic consultations for ASPC-Yuma inmates.  (Doc. 252 ¶ 69.)  Also,
23   the AHCCCS purchase order requirement was "yet another hurdle to clear before an
     appointment could even be scheduled for an inmate."  (*Id.* ¶ 70.)

25         [7] Plaintiff argues that he should not have been transferred from ASPC-Eyman to
     ASPC-Yuma and that a "medical hold" should have been placed on him after Dr. Herrera
26   requested an orthopedic consult and MRI.  (Doc. 292 at 3.)  It appears that Plaintiff may
     be arguing that his transfer to ASPC-Yuma resulted in a delay of medical care; however,
27   Plaintiff has not presented any evidence supporting such a contention.  Moreover, the
28   evidence reflects that his transfer to ASPC-Yuma resulted in the discovery within days of
     his transfer that the May 2010 OCR for an orthopedic consult and possible MRI had not

schedule inmates for non-emergency medical consultations due to the backlog of inmates waiting for consultations, the new requirement of AHCCCS verification, and the limited number of providers.  (*Id*. ¶ 71.)

Plaintiff filed a new HNR dated June 20 asking if he was still scheduled for an MRI and surgery.  (Doc. 175-1 at 42.)  The response to the HNR stated that on May 18, the doctor ordered an x-ray and "ortho consult" and that the information had been referred to the clinical coordinator.  (*Id*.)  Plaintiff filed an Inmate Letter dated June 29, stating that although he did have an x-ray on May 25, he had still not received the MRI or surgery to repair his shoulder.  (*Id*. at 69.)  The response from CO III Johnson, dated July 5, stated that a nurse said Plaintiff was being scheduled for an orthopedic consult but that "there was no reference to any surgery notated."  (*Id*. at 70.)

In June and July 2010, Plaintiff requested prescription refills for ibuprofen.  (Doc. 175-1 at 43-45, 48.)  ASPC-Yuma nursing staff forwarded Plaintiff's refill requests to the pharmacy.  (*Id*.)

On July 7, Plaintiff filed an Inmate Grievance regarding his torn "roto-cup" on his right shoulder, his attempts since January to obtain medical care, and asking when he would receive an MRI and surgery.  (*Id*. at 71-72.)

On August 10, Plaintiff met with Defendant Chenail to discuss the delay in receiving treatment for his shoulder.  (Doc. 252 ¶ 90.)  When Chenail met with Plaintiff, Chenail "was perfectly candid" with Plaintiff "since the ADC had literally lost almost all of its contracts with outside medical specialists following the statutory change in their reimbursement rates."[8]  (*Id*.)  As FHA, Chenail "would not have participated in the prioritizing and scheduling of [Plaintiff's] appointment once there were orthopedists

_____

yet been entered into the system and the OCR was entered on June 16, 2010 by ASPC-Yuma staff.  (*See* Doc. 252 ¶¶ 67-68.)

[8] Plaintiff denies DSOF ¶ 90, asserting that Chenail gave him "wrong information" on August 10 as to available resources for MRIs and consults and that there were 27 vendors and 13 physicians as of July 15, 2010.  (Doc. 293 ¶ 90.)  But Plaintiff does not say what information provided by Chenail was actually wrong.

under contract," and the most Chenail could do for Plaintiff "was to confirm that he was being followed by local ADC providers and to remind him to follow up with another HNR if he believed his shoulder was getting worse and needed attention, or to find out the status with the scheduling of his appointment."[9]   (*Id.* ¶ 94.)

Chenail believed that the procedures ADC used to ensure inmates received necessary medical attention, although not optimal, "adequately addressed this unprecedented situation."  (Doc. 252 ¶ 96.)  Chenail also believed that if Plaintiff brought his shoulder to the attention of local medical staff, they would have determined if he needed immediate orthopedic attention and could have sent him to an emergency room, if needed.[10]   (*Id.*)   Plaintiff did not write to Chenail again about his shoulder care or appointment with an orthopedist, either through a grievance or in any other way; therefore, Chenail "had no reason to believe that [Plaintiff] was not receiving adequate palliative care from local ADC medical providers, while waiting to be scheduled for a consultation with an orthopedist."[11]   (*Id.* ¶ 100.)   Chenail's understanding of Plaintiff's condition in August 2010 was that his shoulder "did not necessitate immediate attention," and the time it was taking for him to have an orthopedic consult and possible MRI "was not likely to affect his outcome or his prognosis."[12]   (*Id.* ¶ 104.)

---

[9] Plaintiff denies DSOF ¶ 94, asserting that Chenail, the providers, and the clinical coordinator were receiving the updates for new contracts and physicians and would have known that there were three facilities in Yuma and physicians for orthopedic services. (Doc. 293 ¶ 94.)

[10] Plaintiff disputes DSOF ¶ 96 and asserts that he "constantly brought the issue of pain & lack of use of arm & hand, from its normal use" to the attention of medical personnel.  (Doc. 293 ¶ 96.)  Plaintiff did file a grievance appeal in September, but other than that, Plaintiff does not point to documentary evidence showing that he brought these issues to anyone's attention at ASPC-Yuma after he met with Chenail in August.

[11] Plaintiff does not dispute or deny DSOF ¶ 100, but states that Chenail has a duty of ensuring that the clinical coordinator "has complied with updates to new contracts to provide specialty services."  (Doc. 293 ¶ 100.)

[12] Plaintiff disputes DSOF ¶ 104 because Dr. Herrera had marked his consult request as "urgent," which Plaintiff contends "does necessitate immediate attention."

Chenail documented his meeting with Plaintiff in an August 12 response to Plaintiff's grievance, stating that Plaintiff arrived at ASPC-Yuma on June 11, that his consult to see the orthopedic specialist was received by the clinical coordinator on June 16, and the request for an orthopedic consult was approved on June 17. (Doc. 175-1 at 73.) Chenail's response also stated that a new contract for orthopedic services would be effective August 15, 2010, but Chenail could not tell Plaintiff when he would be scheduled for an appointment.[13] (Id.)

Plaintiff appealed Chenail's decision in grievance No. Y02-042-010, which arrived at Central Office Health Services on September 10, 2010. (Doc. 252 ¶ 25; Doc. 175-1 at 75-76.) ADC Deputy Director Flanagan responded to Plaintiff's grievance on Defendant Ryan's behalf on September 22, denying the grievance, but stating that Plaintiff had been approved to see a specialist, that an appointment would be scheduled as soon as possible, and that Plaintiff could submit HNRs as needed for questions or for medical assistance.[14] (Doc. 252 ¶¶ 26-27; Doc. 175-1 at 76.)

Plaintiff saw Dr. Barcklay on September 1, 2010, for a physical exam. (Doc. 175 ¶ 41.) The notes from that exam state: "IM states no probs x tendons see cramp in hands & some other M-S issues." The notes indicate that blood tests were ordered, to stop smoking, and to follow up if needed after the labs. (Doc. 175-1 at 46.)

Tucson's Clinical Coordinator notified Feehan on November 18, 2010 that Plaintiff was scheduled for an orthopedic consultation on December 13 at Mountain Vista Medical Center in Mesa, Arizona. (Doc. 252 ¶¶ 72, 103.) The hospital canceled the appointment, and Feehan recalls that the hospital completely discontinued providing medical services to inmates around that time. (Id. ¶ 73.) A new appointment was

(Doc. 293 ¶ 104.)

[13] In his supplemental declaration, Chenail corrected the date of the contract for orthopedic services to July 15, 2010 and said he did not know if the August 15 date was a typographical error or a misunderstanding on his part. (Doc. 252 ¶ 91.)

[14] Plaintiff admits that his grievance appeal was denied but disputes that his grievance was properly processed at each level. (Doc. 293 ¶ 27.)

- 10 -

1   scheduled for Plaintiff at Tempe St. Luke's Hospital for January 26, 2011.  (*Id.*)  Plaintiff
2   did see an orthopedist on January 26, and the specialist recommended right shoulder
3   arthroscopy, subacromial decompression, labral debridement, Mumford's procedure, and
4   possible rotator cuff repair.  (Doc. 252, Ex. D, Attach. 1.)  The procedure was approved
5   by the Central Office on January 31, and surgery was scheduled for March 4.  (Doc. 175-
6   1 at 36 ¶ 36; Doc. 252 ¶¶ 75, 77.)  Plaintiff had the surgery on March 4, 2011 at Tempe
7   St. Luke's Hospital, and he was discharged and returned to ASPC-Yuma on March 10.
8   (Doc. 175-1 at 36 ¶ 37.)  Plaintiff's surgery was successful and he received post-operative
9   care and medication.  (*Id.* ¶¶ 38-42.)

10  **IV.     Eighth Amendment**

11          **A.      Legal Standard**

12          To succeed on a medical-care claim under the Eighth Amendment, a prisoner must
13  demonstrate "deliberate indifference to serious medical needs."  *Jett v. Penner*, 439 F.3d
14  1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are
15  two prongs to the deliberate-indifference analysis: an objective standard and a subjective
16  standard.  First, a prisoner must show a "serious medical need."  *Jett*, 439 F.3d at 1096
17  (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's
18  condition could result in further significant injury or the 'unnecessary and wanton
19  infliction of pain.'"  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled
20  on other grounds, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en
21  banc) (internal citation omitted).  Examples of indications that a prisoner has a serious
22  medical need include "[t]he existence of an injury that a reasonable doctor or patient
23  would find important and worthy of comment or treatment; the presence of a medical
24  condition that significantly affects an individual's daily activities; or the existence of
25  chronic and substantial pain."  *McGuckin*, 974 F.2d at 1059-60.

26          Second, a prisoner must show that the defendant's response to that need was
27  deliberately indifferent.  *Jett*, 439 F.3d at 1096.  The state of mind required for deliberate
28  indifference is subjective recklessness; however, "the standard is 'less stringent in cases

involving a prisoner's medical needs . . . because the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *McGuckin*, 974 F.2d at 1060.  Whether a defendant had requisite knowledge of a substantial risk of harm is a question of fact, and a fact finder may conclude that a defendant knew of a substantial risk based on the fact that the risk was obvious.  *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

"Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment."  *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir.2002) (internal citations and quotation marks omitted).  Deliberate indifference may also be shown by the way in which prison officials provide medical care, *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988), or "by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm."  *Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003).  And deliberate indifference may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need.  *Jett*, 439 F.3d at 1096.  But the deliberate-indifference doctrine is limited; an inadvertent failure to provide adequate medical care or negligence in diagnosing or treating a medical condition does not support an Eighth Amendment claim.  *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citations omitted).  Further, a mere difference in medical opinion does not establish deliberate indifference.  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

Finally, even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference.  *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

. . . .

. . . .

. . . .

1

### B. Discussion

2

#### 1. Serious Medical Need

3      The parties do not appear to dispute that Plaintiff had a serious medical need and
4  Defendants make no argument in this regard.  Plaintiff submitted HNRs, inmate letters,
5  and grievances regarding treatment for his shoulder condition, his pain, and loss of use
6  his right arm and hand.  Moreover, the evidence reflects that at least one ADC doctor and
7  an orthopedic specialist found Plaintiff's condition both worthy of comment and
8  treatment.

9      On this record, a jury could find that Plaintiff's condition constituted a serious
10 medical need.  *See McGuckin*, 974 F.2d at 1059.  The Court, therefore, turns to the
11 subjective prong of the deliberate-indifference analysis.

12

#### 2. Deliberate Indifference

13     When a plaintiff seeks to hold an individual defendant personally liable for
14 damages, the causation inquiry between the deliberate indifference and the Eighth
15 Amendment deprivation requires a very individualized approach that accounts for the
16 duties, discretion, and means of each defendant.  *Leer v. Murphy*, 844 F.2d 628, 633 (9th
17 Cir. 1988).  The Court must look at "whether [each] individual defendant was in a
18 position to take steps to avert the [incident], but failed to do so intentionally or with
19 deliberate indifference." *Id.*

20     Defendants Ryan and Chenail argue first that Plaintiff is attempting to hold them
21 responsible "because of their administrative and supervisory positions" and not because
22 of specific acts or omissions by each of them.  (Doc. 251 at 25.)  Second, Defendants
23 argue that they "were not responsible for the ADC's loss of contracts or the clinical
24 decisions affecting any particular inmate and should be dismissed."  (*Id.*)  Finally,
25 Defendants assert that they are entitled to qualified immunity.

26

##### a. Ryan

27     Ryan argues that he had "no individual involvement in any aspect of [Plaintiff's]
28 medical treatment and he did not handle the single grievance [Plaintiff] sent to his

1  office." (Doc. 251 at 16.)  Therefore, Ryan asserts, he "knew nothing about [Plaintiff's]
2  situation." (*Id*. at 15.)  In his Declaration, Ryan stated that when inmates write to him, he
3  delegates the response to subordinates with expertise in the subject matter at issue.  (Doc.
4  252-1, Ex. A ¶ 9.)  As was his usual practice, Ryan delegated the response to Plaintiff's
5  grievance appeal to ADC Deputy Director Charles Flanagan, who responded on Ryan's
6  behalf.  (*Id*. ¶ 22.)  Flanagan's response included a chronology of Plaintiff's medical
7  visits and treatment provided, noted that Plaintiff had been approved for a consultation,
8  and said Plaintiff would be scheduled for that appointment as soon as possible. (*Id*.¶ 23.)
9  The response also advised Plaintiff to submit HNRs if he had questions or needed
10  medical assistance.  (*Id*.)  After the response issued, Ryan's office was not made aware of
11  any subsequent issues Plaintiff had "with respect to the scheduling of his appointment
12  with a specialist to evaluate his shoulder." (*Id*. ¶ 24.)

13      In this case, the evidence reflects that Ryan did not actually respond to or sign
14  Plaintiff's grievance appeal response.  Thus, there is no evidence that Ryan was aware of
15  Plaintiff's serious medical need or a risk of harm to Plaintiff.  Moreover, it was not
16  inappropriate for Ryan to delegate the response to Plaintiff's medical complaint to
17  Flanagan. *See Peralta*, 744 F.3d at 1087 (defendant not aware of risk of harm where he
18  was not a dentist, he did not independently review medical chart before signing off on
19  appeal and had no expertise to contribute to a review, and he relied on dental staff who
20  investigated the plaintiff's complaints).

21      Other than Plaintiff's grievance appeal and Flanagan's response, there is no other
22  evidence in the record regarding Ryan's involvement in Plaintiff's medical care or that
23  Ryan had the requisite knowledge of a substantial risk of harm to Plaintiff's health.
24  Accordingly, Ryan cannot be liable in his individual capacity for deliberate indifference
25  to Plaintiff's serious medical need. *See Farmer*, 511 U.S. at 837 (a prison official cannot
26  be liable under the Eighth Amendment "unless the official knows of and disregards an
27  excessive risk to inmate health or safety").
28  . . . .

1

**b.    Chenail**

2        Defendants assert that other than responding to administrative complaints, "no

3   facts support . . . that Chenail participated in or failed to prevent the denial, delay, or

4   obstruction of [Plaintiff's] access to medical treatment."  (Doc. 251 at 12.)  Defendants

5   cite to *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) for the proposition that

6   merely responding to administrative complaint is insufficient to establish a constitutional

7   violation.  (*Id.*)

8        To the extent Chenail argues that he is not liable because his only involvement

9   was in the grievance process, he overstates the holding of *Shehee*, a Sixth Circuit opinion.

10  Whether involvement in the grievance process is sufficient personal involvement to state

11  a claim of a constitutional deprivation would depend on several factors, such as whether,

12  at the time of the grievance response, the violation is ongoing, *see e.g.*, *Flanory v. Bonn*,

13  604 F.3d 249, 256 (6th Cir. 2010), or the unconstitutional conduct is completed, *see*

14  *Shehee*, 199 F.3d at 300, and whether the defendant responding to the grievance has

15  authority to take action to remedy the alleged violation, *see Bonner v. Outlaw*, 552 F.3d

16  673, 679 (8th Cir. 2009).  Further, under Sixth Circuit law, liability under § 1983 requires

17  "active unconstitutional behavior; failure to act or passive behavior is insufficient."  *King*

18  *v. Zamiara*, 680 F.3d 686, 706 (6th Cir. 2012).  But under Ninth Circuit law, a defendant

19  can be liable for the failure to act.  *See Taylor*, 880 F.2d at 1045.

20       Here, Chenail did more than simply respond to Plaintiff's grievance.  He also met

21  with Plaintiff on August 10, 2010, to discuss the delay in scheduling Plaintiff for an

22  orthopedic consult.   Moreover, Chenail actually signed the August 12 response to

23  Plaintiff's grievance.  (Doc. 175-1 at 73.)

24       Chenail, however, argues that, like Ryan, he "relied on other staff members with

25  clinical experience to draft his grievance responses and then discuss them with him."

26  (Doc. 251 at 15.)  In his Declaration, Chenail stated that upon receiving a grievance, his

27  office's practice was to have either the Clinical Coordinator or a staff member in the

28  Medical Records unit request the relevant records and draft a proposed response for

1   Chenail to review and discuss.  (Doc. 252, Ex. D ¶ 12.)  If the grievance required further

2   attention, Chenail "would often direct the assigned staff member either to make an

3   inquiry of the nursing staff or to further review the inmate's medical records."  (*Id*.)

4   Chenail asserts that he "does not specially recall if he saw [Plaintiff's] records when he

5   responded to [Plaintiff's] grievance relating to his shoulder treatment."  (*Id*. ¶ 11.)

6       In *Peralta*, the Ninth Circuit held that a Chief Medical Officer, who was not a

7   doctor but signed an inmate's second-level appeal, was not deliberately indifferent to the

8   inmate's serious medical need because the officer did not independently review the

9   inmate's claims or read his chart before signing off on the second-level appeal.  744 F.3d

10  at 1086.  Nor did the court accept the plaintiff's argument that a reasonable jury could

11  conclude that by signing off on second-level appeals and placing inmates back on the

12  extensive waiting list without reviewing their records supports that the officer was

13  deliberately indifferent.  *Id*.  The court found that the officer's decision to sign appeals

14  "that he knew had already been reviewed by at least two qualified dentists, when he had

15  no expertise to contribute to that review, isn't a wanton infliction of unnecessary pain."

16  *Id*. at 1087.

17      Unlike *Peralta*, where the Chief Medical Officer knew that two dentists had

18  reviewed the plaintiff's second-level appeal, Chenail never states who specifically

19  reviewed Plaintiff's medical records in preparing a response to Plaintiff's grievance

20  appeal and he does not recall if he reviewed Plaintiff's records.  Chenail's Declaration

21  speaks hypothetically about his general practice when he receives a grievance of having

22  either the Clinical Coordinator or another staff member request the relevant records and

23  draft a proposed response for Chenail to review and discuss.  (Doc. 252 at 89.)  Although

24  Chenail implies he did not prepare the response to Plaintiff's grievance, he does not say

25  that he did not prepare the response.  Moreover, Chenail's response to Plaintiff's

26  grievance discusses the May 2010 OCR, which Dr. Herrera had marked as "urgent."

27  Thus, there is a disputed question of fact regarding Chenail's awareness of the OCR and

28  Plaintiff's serious medical need.  *Farmer*, 511 U.S. at 842.

1    Even though there is a question of fact regarding Chenail's awareness of a risk of
2    harm to Plaintiff's health, the Court must also examine whether Chenail was deliberately
3    indifferent to that risk of harm, in particular, whether the delay in scheduling Plaintiff
4    was attributable to Chenail or excused by a lack of resources.  *See Peralta*, 744 F.3d at
5    1084 ("A prison medical official who fails to provide needed treatment because he lacks
6    the necessary resources can hardly be said to have intended to punish the inmate.")
7    Chenail asserts that although the request for Plaintiff's orthopedic consult was promptly
8    approved within days of Plaintiff's arrival at ASPC-Yuma, at that time "there were only
9    two general orthopedists in the entire state who remained under contract to treat ADC
10   inmates, with emergency room care as the only other ready alternative when a situation
11   warranted it."  (Doc. 252 ¶ 93.)

12       Plaintiff disputes the number of orthopedists under contract with ADC at the time
13   of Chenail's grievance response and he contends there were 27 vendors and 13
14   physicians available to see inmates "awaiting orthopedics consult &/or MRIs."[15]  (Doc.
15   293 ¶¶ 90, 93.).  It appears that Chenail is referring to the number of orthopedists under
16   contract in June 2010, when Plaintiff arrived at ASPC-Yuma, and that Plaintiff is
17   referring to the number of orthopedists under contract in August 2010.  It is undisputed
18   that until June 2010, there were only two orthopedists serving the ADC throughout
19   Arizona.  Then, on August 19, 2010, after entering into a contract with Iasis, ADC
20   updated its list of available specialty providers to include nine orthopedic physicians.
21   (Doc. 252 ¶¶ 42, 43.)

22       While the parties appear to differ on the actual number of orthopedic physicians
23   under contract by mid-August 2010 (nine vs. thirteen), the critical issue is the length of
24   time it took to schedule Plaintiff to see one of those orthopedic physicians.  The evidence
25   reflects that ADC was seeking new medical providers after the cancellation of its

27   [15] It is not clear whether Plaintiff is saying there were thirteen orthopedic
28   physicians under contract with ADC in August 2010 or if there were some non-
     orthopedic physicians included in those thirteen.

1    contracts in late 2009. (Doc. 252 ¶¶ 36-45.). Moreover, it is undisputed that given the

2    loss of contracts with outside providers, ADC instituted a new centralized process for

3    scheduling outside consultations, and that under this process the ASPC-Tucson Clinical

4    Coordinator was responsible for scheduling orthopedic consultations for ASPC-Yuma

5    inmates. (*Id.* ¶¶ 64, 69.) Within a week of Plaintiff's arrival at ASPC-Yuma on June 11,

6    2010, Clinical Coordinator Feehan had entered the OCR into the database and she

7    received approval from the Central Office on June 17. (*Id.* ¶¶ 68, 69.) The next day,

8    Feehan faxed the approved OCR to the Clinical Coordinator at ASPC-Tucson to obtain a

9    purchase order from AHCCCS and for the ASPC-Tucson Clinical Coordinator to

10   schedule an appointment for Plaintiff. (*Id.* ¶¶ 68-70.)

11       Chenail contends that as FHA for ASPC-Yuma, he "would not have participated

12   in the prioritizing and scheduling of [Plaintiff's] appointment once there were

13   orthopedists under contract." (Doc. 252 ¶ 94.) Plaintiff responds that Chenail was

14   reviewing the updates on contracts for outside services and would have known that there

15   were three facilities and physicians in Yuma for orthopedics services. (Doc. 293 ¶ 94.)

16   Plaintiff also contends that Chenail was responsible for ensuring that the clinical

17   coordinator complied with the updates, (*id.* ¶ 100), but he provides no evidence that

18   Chenail could have scheduled Plaintiff's appointment sooner.

19       Plaintiff appears to argue that as a member of the ASPC-Yuma Medical Review

20   Committee, Chenail had "the authority to send the request to the Central Office's Medical

21   Review Board." (Doc. 293 ¶ 81, in part.) It is not clear if Plaintiff is arguing that

22   Chenail should have sent a second request to the Medical Review Board since the

23   Medical Review Board had already approved Plaintiff's OCR on June 17, 2010. (*See*

24   Doc. 252 ¶ 68; Doc. 301 at 4.) Once the Board had approved the OCR, Sheehan faxed it

25   to ASPC-Tucson for scheduling. Therefore, it does not appear there was any need for

26   Chenail to convene the Medical Review Committee again in Yuma and obtain another

27   approval from the Central Office's Medical Review Board for Plaintiff's orthopedic

28   consult.

The Court finds that there is no evidence that any delay in Plaintiff's outside consultation with an orthopedist is attributable to Chenail.  Chenail specifically attests that he was not responsible for either procuring new contracts with providers or in scheduling inmates for outside consults once new providers were under contract.  (Doc. 252 ¶¶ 83, 94.)  While Plaintiff appears to argue that as soon as new contracts were established, Chenail should have immediately scheduled Plaintiff for a consultation, there is no evidence that Chenail had such authority or that Chenail caused a delay in scheduling Plaintiff's consultation.

In addition, Chenail asserts that if Plaintiff brought his shoulder to the attention of local medical staff, they would have been able to determine if it needed immediate orthopedic attention and could have taken steps to have Plaintiff sent to an emergency room.  (Doc. 252 ¶ 96.)  Plaintiff's only response to this statement is that he "constantly brought the issue of pain & lack of use of arm & hand, from its normal use."  (Doc. 293 ¶ 96.)  Plaintiff, however, presents no evidence that he brought these issues to Chenail's attention or even to the local medical staff's attention after he met with Chenail.  Indeed, as Defendants note, Dr. Barcklay examined Plaintiff on September 1, 2010, and Barcklay "did not identify any urgent need for an orthopedic referral."  (Doc. 301 at 4.)  Nor do the notes from that exam reflect any mention of shoulder issues, shoulder pain, or an emergency.  (*See* Doc. 175-1 at 46.)  Accordingly, Chenail responded reasonably to the loss of contracts and was not deliberately indifferent to Plaintiff's serious medical needs. *See Farmer*, 511 U.S. at 845 ("prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted").

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 254) and Plaintiff's Cross-Motion for Summary Judgment (Doc. 292).

(2)    Defendants' Motion for Summary Judgment (Doc. 254) is **granted**.

1    (3)    Plaintiff's Cross-Motion for Summary Judgment (Doc. 292) is **denied**.

2    (4)    This action is terminated with prejudice.  The Clerk of Court must enter

3    judgment accordingly.

4    DATED this 4th day of March, 2015.

Honorable Stephen M. McNamee
Senior United States District Judge